# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Jodie M. S.,                                            Civ. No. 21-1474 (BRT)

      Plaintiff,

v.                                                      **MEMORANDUM**
                                                        **OPINION AND ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security,

      Defendant.

---

Edward C. Olson, Esq., Disability Attorneys of Minnesota; Karl E. Osterhout, Esq., Osterhout Disability Law, LLC, counsel for Plaintiff.

James D. Sides, Esq., Social Security Administration, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jodie M. S. seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. In 2015, Plaintiff was injured in a car accident when she pulled over to assist another car that had hit a deer on the interstate. As she was kneeling on the driver's seat, a truck hit the other vehicle and propelled it into her vehicle. Plaintiff suffered an injury to her brain. The injury impacted her cognitive skills, including her ability to remember and communicate. Plaintiff has sought treatment from a variety of medical professionals ever since.

Plaintiff filed a Complaint with the Court on June 23, 2021, appealing the denial of disability benefits by the Social Security Administration. This matter now is before the Court on the parties' cross-motions for summary judgment, in accordance with D. Minn. LR 7.2(c)(1). (Doc. Nos. 21, 30.) For the reasons set forth below, Plaintiff's motion is granted in part and denied in part and Defendant's motion is denied.

## BACKGROUND

**I.  Procedural History**

**A. The ALJ's first decision and remand**

On October 17, 2016, Plaintiff protectively filed for disability insurance benefits under Title II of the Social Security Act, alleging a disability onset date of July 13, 2016. (Tr. 189–92.)[1] The Social Security Administration ("SSA") denied Plaintiff's application and again on reconsideration. (Tr. 121–26, 132–35.) On December 20, 2018, following a hearing, an Administrative Law Judge ("ALJ") found that Plaintiff was not disabled. (Tr. 11–31.) In his December 20, 2018 decision, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since July 13, 2016, her alleged onset date.[2] (Tr. 16.) At step two, the ALJ found Plaintiff had the following severe

---

[1]  Throughout this Memorandum Opinion and Order, the abbreviation "Tr." is used to reference the administrative record. (Doc. No. 20.)

[2]  The SSA has established a five-step sequential process for determining whether a person is disabled. 20 C.F.R. § 416.920(a)(4) (explaining the five-step sequential evaluation process). Steps one through three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her disability meets or equals a listed impairment. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); 20 C.F.R. §§ 416.920(a)-(d), 404.1522. If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds

impairments: bilateral carpal tunnel syndrome, cognitive impairment related to history of traumatic brain injury, lumbar and cervical degenerative disc disease, major depressive disorder, obesity, post-traumatic stress disorder, and right shoulder degenerative joint disorder. (Tr. 17.) At step three, the ALJ found Plaintiff's impairments did not meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.) The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except she could never climb ropes, ladders, or scaffolds; she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and reach overhead bilaterally; she could frequently handle and finger bilaterally; and she could have no exposure to unprotected heights or hazards. (Tr. 20.) The ALJ also limited Plaintiff to simple routine tasks. (Tr. 20.) At step four, the ALJ found Plaintiff was able to perform her past relevant work as a sales attendant. (Tr. 29.) Alternatively, at step five, the ALJ found Plaintiff could perform other unskilled work existing in significant numbers in the national economy. (Tr. 30.) Consequently, the ALJ determined Plaintiff was not disabled. (Tr. 31.) On June 26, 2019, the SSA's Appeals Council denied Plaintiff's request for review. (Tr. 1–5.) Afterward, Plaintiff filed a civil action in this

---

to steps four and five. *Pate-Fires*, 564 F.3d at 942; *see also* 20 C.F.R. § 416.920(e). Before step four, the ALJ assesses the claimant's RFC, "which is the most a claimant can do despite her limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009); *see also* 20 C.F.R. §§ 416.920(e), 404.1545; 416.945(a) ("Your residual functional capacity is the most you can still do despite your limitations."). At step four, the ALJ must determine whether the claimant can return to his past relevant work. 20 C.F.R. § 416.920(f). If the ALJ finds at step four that a claimant cannot return to past relevant work, the burden shifts to the SSA at step five to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.* §§ 416.920(g), 912, 960(c).

Court on August 22, 2019. (Tr. 888); *see also Schilling v. Saul*, No. 19-CV-02327 (D. Minn.).

Meanwhile, Plaintiff filed a subsequent disability application on July 31, 2019, which the Social Security Administration denied at the initial, (Tr. 977–82), and reconsideration levels. (Tr. 984–87.) Plaintiff then requested a hearing before an ALJ on August 17, 2020. (Tr. 988–89.) On September 10, 2020, before a hearing was held on Plaintiff's second disability application, this Court remanded the case involving the first application for further administrative proceedings, (Tr. 951–58), and ordered the following:

> [T]he ALJ should consider Dr. Bergquist's medical opinions and reconsider Plaintiff's RFC. If the ALJ determines that Dr. Bergquist's conclusions regarding Plaintiff's limitations are insufficiently supported, then the record should be more fully developed as to these limitations. After such evaluation, the ALJ should then reconsider Plaintiff's RFC and reconsider steps four and five of the sequential-evaluation process.

(Tr. 957.)[3]

### B. The hearing following remand

Following this Court's order, the Appeals Council consolidated Plaintiff's two disability applications (including the application remanded from this Court) and sent

---

[3]   The Court heard oral argument on the matter on September 3, 2020, and then ruled on the record at the hearing, granting in part Plaintiff's motion for summary judgment and denying Defendant's motion for summary judgment. *Schilling*, No. 19-CV-02327, Doc. No. 22 (D. Minn. Sept. 3, 2020). This decision was not appealed. Judgement was entered on September 11, 2020, *id.* at Doc. No. 25 (D. Minn. Sept. 11, 2020), and the Court issued an Order on Plaintiff's Motion for Attorney Fees on December 29, 2022. *Id.* at Doc. No. 30 (D. Minn. Dec. 10, 2020).

them to the ALJ who had issued the first decision for another hearing and decision.[4] (Tr. 962–64.) On remand, the ALJ admitted new evidence into the record and held a new hearing on March 16, 2021, on Plaintiff's consolidated claims, at which Plaintiff and a vocational expert testified. (Tr. 826–53). At the hearing, Plaintiff testified that she worked as a sampler at Kwik Trip between six to nine hours a week and a caretaker for five hours a week. (Tr. 834.) She stated she suffered from memory issues and fatigue stemming from her brain injury and that she had difficulty following instructions. (Tr. 834–43.) Assuming an RFC of light work with limitations, the vocational expert testified that Plaintiff would be able to work her previous job as a sales attendant as well as the job of hand packager, routing clerk, or garment sorter. (Tr. 849–50.)

### C. The ALJ's second decision following remand

On April 20, 2021, the ALJ issued his second decision following remand. (Tr. 761–805.) The ALJ found at step one that Plaintiff worked after her alleged disability onset date, but that the earnings did not rise to the level of substantial gainful activity. (Tr. 768.) At step two, the ALJ found Plaintiff had the following severe impairments: bilateral carpal tunnel syndrome; chronic pain syndrome; cognitive impairment related to history of traumatic brain injury; left rotator cuff disorder; lumbar and cervical degenerative disc disease; major depressive disorder; obesity; posttraumatic stress

---

[4]      The Court notes that the ALJ who decided Plaintiff's case is the same ALJ who was the subject of the Court's decision in *Stephanie G. v. Kijakazi*. *See generally* No. 21-CV-1290 (WMW/BRT), 2022 WL 3572936 (D. Minn. Aug. 19, 2022). In *Stephanie G.*, the Court concluded that the ALJ was not properly appointed and thus lacked the authority to hear and decide the plaintiff's case. *Id.* at *6. Plaintiff does not raise the issue of the ALJ's authority in this matter.

disorder; and right shoulder degenerative joint disorder. (Tr. 768–69.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 771–79.)

Before step four, the ALJ determined Plaintiff retained an RFC to perform light exertional work subject to certain nonexertional limitations, including the mental limitations pertinent to this appeal of simple, routine, and repetitive tasks. (Tr. 780.) More specifically, as to Plaintiff's mental impairments, the ALJ determined that Plaintiff managed her mental impairments "much better than she asserted" and that her mental impairments and allegations of pain "resulted in no more than mild and moderate limitations . . . in the areas of understanding, remembering, or applying information and concentrating, persisting, or maintaining pace." (Tr. 792.) The ALJ also placed no weight on opinions from Drs. Bergquist, Dickson, and Wiger, who concluded that Plaintiff would not be successful in independently pursuing full or part-time employment. (Tr. 795–801.) At step four, the ALJ relied on a vocational expert's testimony to find Plaintiff was able to perform her past relevant work as a sales attendant as generally performed in the national economy. (Tr. 802–03.) Alternatively, at step five, the ALJ found Plaintiff could also perform other work existing in significant numbers in the national economy, including work as a hand packager, routing clerk, and garment sorter. (Tr. 803–04.) Thus, the ALJ found Plaintiff was not disabled. (Tr. 804.) The ALJ's decision stands as the final decision of the Commissioner subject to judicial review.

## II.    Relevant Evidence

The Court adopts and incorporates the facts contained in the Administrative

Record (Doc. No. 14), and will include the relevant facts as necessary in the discussion

below.

## DISCUSSION

## I.    Standard of Review

A claimant is disabled if she is unable to "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's

impairments must be "of such severity that she is not only unable to do her previous work

but cannot, considering her age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy." *Id.* §

423(d)(2)(A).

The claimant bears the burden of proving disability. *Whitman v. Colvin*, 762 F.3d

701, 705 (8th Cir. 2014). Once the claimant demonstrates that she cannot perform past

work due to a disability, "the burden of proof shifts to the Commissioner to prove, first

that the claimant retains the residual functional capacity to do other kinds of work, and,

second that other work exists in substantial numbers in the national economy that the

claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations

omitted).

The Court has the authority to review the Commissioner's final decision denying disability benefits to Plaintiff. 42 U.S.C. § 405(g); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, then the decision will be upheld. 42 U.S.C. § 405(g); *Kluesner*, 607 F.3d at 536 (citations omitted). "[T]he substantiality of the evidence must take into account whatever fairly detracts from its weight, and the notable distinction between 'substantial evidence' and 'substantial evidence on the record as a whole,' must be observed." *Bauer v. Soc. Sec. Admin.*, 734 F. Supp. 2d 773, 799 (D. Minn. 2010) (citations omitted). This test requires "more than a mere search of the record for evidence supporting the Secretary's findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

## II.   Analysis

Plaintiff argues the ALJ erred by failing to properly evaluate the medical opinion evidence pertaining to her mental impairments. (*See generally* Doc. No. 22, Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.").) More specifically, Plaintiff argues that the opinions of Drs. Bergquist, Dickson, and Wiger are consistent with and supported by the record. Plaintiff also argues that the ALJ did not properly analyze her subjective complaints. In response, the Commissioner argues that the ALJ both properly weighed the medical opinions and properly analyzed her subjective complaints. (*See generally* Doc. No. 31, Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.").)

**A. The medical opinions of Plaintiff's treating physician Dr. Thomas Bergquist**

**i. Dr. Bergquist's 2018 and 2021 opinions**

Dr. Thomas Bergquist is a psychologist who treated Plaintiff for her cognitive issues. On August 30, 2018, after meeting with Plaintiff several times since 2015, he filled out a Medical Source Statement ("MSS"), opining on Plaintiff's cognitive challenges. Dr. Bergquist reported that Plaintiff's "current cognitive challenges including memory attention and particularly problems with multitasking will limit her ability to function in a competitive work setting." (Tr. 740.) He also noted testing from October 15, 2015, showing "limited impairments in memory functioning, and more notable impairments" in other aspects. (Tr. 742.) Dr. Bergquist further opined that Plaintiff was not a malingerer and that, out of 21 various mental abilities needed to do work, Plaintiff had 14 "[n]one or mild" and "moderate" limitations in certain areas, along with 5 "marked"[5] limitations in the following areas: maintain attention and concentration for more than two-hour segments, responding appropriately to changes in the work setting, traveling in unfamiliar places or using public transportation, ability to set realistic goals or make plans independently of others, and ability to tolerate normal levels of stress.[6]

---

[5]   "Marked" is defined in Dr. Bergquist's opinion as indicating a "serious limitation in this area" and that "[t]here is substantial loss in the ability to function independently, appropriately, and effectively on a sustained basis." (Tr. 742.)

[6]   Of the 21 mental functions, it appears that Dr. Bergquist did not place a check mark next to two mental functions: "[s]ustain an ordinary routine without special supervision" and "[a]sk simple questions or request assistance." (Tr. 742.) However, in his later 2021 opinion, Dr. Bergquist *did* place a check mark next to these two mental functions, indicating a moderate limitation for "[s]ustain an ordinary routine without special

(Tr. 739, 742.) Dr. Bergquist concluded that Plaintiff needed at least one unscheduled break every 30–60 minutes during an 8-hour workday and would likely be absent from work more than 3 days per month as a result of her impairments and/or necessary medical treatment. (Tr. 740.)

Plaintiff continued to meet with Dr. Bergquist, who completed a second MSS on February 3, 2021. (Tr. 1582–86.) In the 2021 MSS, Dr. Bergquist noted, among other symptoms, that Plaintiff suffered from problems with judgment, speech/communication difficulties, difficulty remembering, confusion, depression, fatigue, headaches, and vertigo/dizziness. (Tr. 1582.) Dr. Bergquist affirmed from his August 2018 MSS that Plaintiff still needed unscheduled breaks during an 8-hour workday, and noted that she would need one break every ten minutes. (Tr. 1585.) He also affirmed that Plaintiff would be absent from work more than 3 days per month as a result of her impairments and/or necessary medical treatment. (*Id.*) He noted that Plaintiff suffered from "[m]emory/cognitive impairment" and "significant mental fatigue." (*Id.*) And he also affirmed all but one of the same "marked" limitations from his August 2018 MSS[7] and added two more "marked" limitations in the following areas: "understand and remember detailed instructions" and "complete a normal work day and work week, without

---

supervision" and a "none or mild" limitation for "[a]sk simple questions or request assistance." (Tr. 1584.)

[7]     The one limitation that Dr. Bergquist downgraded from "marked" to "moderate" was Plaintiff's "[a]bility to set realistic goals or make plans independently of others." (Tr. 1584.)

interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 1584.)

### ii. The ALJ's decision regarding Dr. Bergquist's 2018 and 2021 opinions

As noted above, Dr. Bergquist's August 2018 opinion was the subject of this Court's remand to the Commissioner for further proceedings. On remand, the ALJ considered Dr. Bergquist's August 2018 opinion as well as Dr. Bergquist's 2021 opinion. (Tr. 761–805.) The ALJ gave Dr. Bergquist's August 2018 opinion no weight. (Tr. 796.) In doing so, the ALJ explained that "[a]s a whole, [Dr. Bergquist's August 2018] opinion was inconsistent with the totality of the evidence of record." (*Id.*) More specifically, the ALJ found that Dr. Bergquist's opinion was inconsistent with:

- Dr. Bergquist's own assessment of Plaintiff having mild and moderate assessments in areas of her mental functioning;

- Plaintiff's daily activities, including her ability to do self-care, perform household chores, drive, visit family and friends, walk the dog, watch television, and work two part-time jobs;

- Plaintiff's self-reported 2018 Patient Health Questionnaire-9 ("PHQ-9") and Generalized Anxiety Disorder-7 ("GAD-7") scores, which, according to the ALJ, "were in the mild and moderate range,"

- Plaintiff's mental status exams,

- Plaintiff's failure to complete her brain rehabilitation therapy program, and

- Dr. Bergquist's own assessment of the claimant's third set of neuropsychological testing results from October 31, 2018.

(Tr. 796.) Thus, because the ALJ found Dr. Bergquist's 2018 opinion inconsistent with the medical record, the ALJ gave Dr. Bergquist's 2018 opinion no weight.

11

The ALJ also considered Dr. Bergquist's 2021 opinion. The ALJ gave "great weight" to the *portion* of Dr. Bergquist's 2021 opinion that found Plaintiff had mild and moderate limitations in several mental abilities needed to do work. (Tr. 798.) However, the ALJ placed "no weight" on the portion of Dr. Bergquist's opinion that noted that Plaintiff had marked limitations in 7 of the 21 mental abilities needed to do work activities, required an extra 10-minute break every hour, and would be absent more than 3 days per month. (*Id.*) The ALJ supported his decision to give no weight to this portion of Dr. Bergquist's opinion by noting that Plaintiff had not followed Dr. Bergquist's recommendation to limit her exposure to watching the news and because "Dr. Bergquist was also knowledgeable about the claimant's failure to utilize memory recommendations, techniques, or devices taught by him in 2018 and the brain rehabilitation therapist in December 2020." (*Id.*)

### iii. Dr. Bergquist's 2018 and 2021 opinions are consistent with the record

Plaintiff argues that because Dr. Bergquist's 2018 and 2021 opinions are consistent with the record, the ALJ failed to provide good reasons for giving Dr. Bergquist's opinions no weight instead of controlling weight. A treating physician's opinion regarding an applicant's impairment is granted controlling weight so long as it is well supported by medically acceptable evidence and not inconsistent with other substantial evidence in the record. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The ALJ "may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician offered inconsistent opinions." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). The

ALJ must "always give good reasons" for the weight assigned to a treating physician opinion. 20 C.F.R. § 404.1527(c)(2). The regulations require the ALJ to consider the presence of examining or treating relationships, the nature and frequency of such relationships, the evidence supporting the opinions, the consistency of the opinion with the record as a whole, the specialization of the person giving the opinion, and any other factors that support or refute the opinion. 20 C.F.R. § 404.1527(c). Additionally, the longer a treating source has treated the disability claimant and the more times the claimant has been seen by a treating source, the more weight will be given to the source's medical opinion.[8] 20 C.F.R. § 404.1527(c)(2)(i).

The Court finds that, contrary to the ALJ's findings, substantial evidence demonstrates Dr. Bergquist's 2018 and 2021 opinions are consistent with the medical record, which demonstrates that Plaintiff suffered from significant cognitive limitations. As already noted, Plaintiff suffered head injuries from a car accident. At the scene of the accident, Plaintiff complained of headache and confusion and was transported to the ER. (Tr. 315.) Five days later, she complained of "dizziness." (*Id.*) Plaintiff then underwent cognitive testing with psychologist Dr. Pamela Anderson, which indicated that she "took nearly twice as long to complete the cognitive testing as standard." (*Id.*)

In July 2015, Plaintiff began treating at the Brain Rehabilitation Program out of Mayo Clinic. (*Id.*) On July 18, 2015, she met with Dr. Bryndon B. Hatch, M.D., within

---

[8]     Because Plaintiff filed her claim for social security benefits before March 27, 2017, the old regulations apply. *See* 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply").

the Brain Rehabilitation Program. (*Id.*) She complained of memory difficulties and noted she had forgotten the names of people she had known for years. (*Id.*) She also had started to miss deadlines and forget to turn in paperwork and forms. (Tr. 315–16.) And she continued to suffer from dizziness and needed people to repeat instructions to her multiple times. (Tr. 316.)

Dr. Hatch performed a Kokmen Mental Status exam. (Tr. 317.) Plaintiff scored a 32/38 but required a large amount of time for answering questions, with frequent pausing and asking for repeating of the instructions. (*Id.*) Dr. Hatch concluded that Plaintiff was possibly suffering from a traumatic injury/concussion and noted that Plaintiff would meet with one of the neuropsychologists for further evaluation. (Tr. 318.)

On August 5, 2015, Plaintiff met with Dr. Bergquist. (Tr. 322.) During her appointment, she completed a GAD-7 (obtaining a total score of 11) and a PHQ-9 (obtaining a total score of 10), which, according to Dr. Bergquist, "are towards the lower end of the moderately elevated range." (*Id.*) He recommended a possible course of cognitive rehabilitation to assist her. (Tr. 322.) Plaintiff then met with Jessica L. Petersen, O.T., for an occupational therapy evaluation on September 2, 2015, in which she again reported similar cognitive issues:

> [Plaintiff] reports that she has difficulty remembering people's names, even those she has known for a long time. This "drives her crazy" because she is a people person and knowing names is important in her sales position. She also reports difficulty comprehending e-mail addresses and phone numbers and tends to transpose numbers when she writes them down. She reports that her short term memory is poor, often forgetting things she was told just moments prior. She also reports an increase in fatigue.

14

(Tr. 325.) Petersen concluded that Plaintiff was "experiencing persistent cognitive difficulties" and recommended cognitive rehabilitation therapy. (Tr. 326.)

On October 19, 2015, Dr. Alissa Butts performed psychometric testing. (Tr. 328–31.) Testing revealed a verbal IQ score of 72. (Tr. 328.) Dr. Butts noted that Plaintiff's mood was somewhat dysphoric and her attention and concentration to task were variable. (Tr. 330.) She required frequent repetition and clarification of testing instructions as well as encouragement to persist with challenging items. (*Id.*) Dr. Butts noted that relative to individuals of comparable age, her overall intellectual abilities were in the mildly low range, which was lower than expected given her educational and occupational background. (*Id.*) Plaintiff's immediate and delayed recalls of visual information were moderately and mildly impaired, respectively. (Tr. 331.) Dr. Butts indicated that Plaintiff's scores on performance validity measured from well below cutoff to acceptable and as a result, lower scores were difficult to interpret due to the fluctuating ability to engage in testing. (*Id.*) She further noted Plaintiff's variability in being able to engage with testing may resemble her cognitive variability in day-to-day functioning. (*Id.*)

Dr. Bergquist reviewed the psychometric testing on November 11, 2015. (Tr. 332.) He indicated the following:

> On recent psychometric testing, done by Dr. Alissa Butts on October 19, 2015, there were some positive findings with main principal difficulties in the area of executive functioning and also some difficulty with word retrieval and naming. Her verbal learning and memory is actually quite good, though she did have difficulty with visual spatial learning and retention. She also with regard to executive functioning, showed problems in areas of inductive reasoning ability as well as problems with mental flexibility and visual spatial analysis and integration skills.

(*Id.*) Dr. Bergquist then concluded that the testing seemed to "validate and correlate" Plaintiff's symptomatic complaints, though he did recognize that her "poor performance" might be in part because her anxiety and stress was interfering with her performance. (*Id.*) Plaintiff completed another GAD-7 (total score of 9, which is "mildly elevated") and a PHQ-9 (total score of 15, which is "moderately to approaching severely elevated"). (*Id.*) Dr. Bergquist recommended that Plaintiff work no more than six hours a day due to her current cognitive difficulties. (Tr. 333.)

Plaintiff continued to visit the Brain Rehabilitation Program throughout the remainder of 2015 and 2016, during which time she continued to complain of the same cognitive difficulties. Notably, she had difficulty communicating and would ask for things to be repeated. (Tr. 353, 359.) She would also forget to attend appointments. (Tr. 361.) During a mental status exam on September 13, 2016, Karla A. Schroder, APRN, CNS, MS, indicated Plaintiff was still suffering from some cognitive limitations: "She is a bit distractible. She definitely has difficulty with word finding. She is not able to provide much medical history and occasionally asks me to repeat information we discussed earlier in the interview." (Tr. 367.)

Plaintiff's mental issues continued into 2017, when Dr. Pamela M. Petersen, PhD, LP, indicated that Plaintiff appeared "clearly more confused and easily distracted" and that she had a "very poor memory." (Tr. 568.) On February 13, 2017, Dr. Petersen, as part of administering a Million Clinical Multiaxial Inventory-III ("MCMI-III") test, noted that Plaintiff was preoccupied, confused, emotionally exhausted, frustrated, easily distracted, and guarded, and that she had issues with word retrieval and "[e]xtreme

difficulty with word comprehension." (Tr. 590.) On February 21, 2017, Dr. Jeremy J.

Solberg, M.D. noted in his mental status exam of Plaintiff that she was easily tearful,

clearly frustrated, had difficulty giving her history at times regarding her memory

symptoms, and was quite vague at times. (Tr. 607.) During an examination on March 14,

2017, Plaintiff asked her provider to repeat things. (Tr. 628.) On March 15, 2017,

Dr. Solberg noted that the severity of Plaintiff's mental status changes was difficult to

assess without further psychiatric measurements but that she had suffered from short-

term memory loss and changing cognition which was apparent in speaking with her

briefly in the examination room. (Tr. 608.) On examination she seemed to be in a low

mood and had difficulty describing the type of treatment she received the previous day.

(*Id.*)

Plaintiff's difficulties understanding questions and memory issues continued

throughout many of her appointments and was constantly noted by her providers. (*See,

e.g.*, Tr. 611 (noting on April 19, 2017, that Plaintiff had difficulty remembering and

asked the same questions repeatedly); Tr. 662 (indicating on April 26, 2018, that Plaintiff

suffered from disorganized and repetitive thoughts); Tr. 727 ("There is delay on several

occasions in following commands during the examination, requiring verbal cues for some

procedural maneuvers."); Tr. 728 (reporting on July 11, 2018, difficulties with word

finding); Tr. 733 (noting on September 4, 2018, that Plaintiff appeared confused and

tired); Tr. 744 (noting on October 1, 2018, that Plaintiff's thought processes was scattered

and forgetful); Tr. 745 ("Subjectively I do feel that [Plaintiff's] cognitive status has

declined, she is having a harder time word finding and with recollection even with short

term conversations in clinic."); Tr. 1264 ("Her memory difficulties, processing difficulties, relationship difficulties come across as very believable in this patient who is struggling to accommodate the effects of closed head trauma."); Tr. 1275 ("On today's evaluation her major difficulty is attentional and in review of her history and the examples she provides, I anticipate in many of these situations the patient is not initially registering the stimuli she is trying to later recall."); Tr. 1398 (noting on June 25, 2022, that Plaintiff was very forgetful during the examination and required multiple repetition in instructions as well as written instructions in order to recall information); Tr. 1420 (noting on November 19, 2020, that Plaintiff was very forgetful during the examination and needed repetition as well as written instructions); Tr. 1551 (indicating on December 7, 2020, that Plaintiff had intermittent loss of her train of thought as well as word finding difficulty during the examination); Tr. 1634 (noting on January 21, 2021, that Plaintiff was forgetful and her thoughts disorganized); Tr. 1632 (reporting on February 2, 2021, that Plaintiff showed "some difficulty tracking questions, and I did need to repeat what I asked her on a few occasions").

Additionally, during this time, a neuropsychological assessment was performed by Solveig Hultgren, MA, LPCC, on April 11, 2017, which, along with the psychometric testing from 2015, showed lower neuropsychological functioning. (Tr. 649–56.) The results of the test indicated that Plaintiff's "overall intellectual level f[ell] below average range," that she had "performed below the average range on measures" of verbal comprehension and perceptual reasoning, and that she "performed in the impaired range" in working memory and in the "low average range" in processing speed. (Tr. 650.) As

part of the assessment, Hultgren concluded that Plaintiff was "unable to process information quickly or hold onto information in order to complete a specific task at a later date" and that her "ability to organize, sequence, initiate, and monitor her performance falls well below the average range and is reflective of the physiological effects of the car accident upon her cognitive functioning." (Tr. 655–56.)

These records and more are consistent with Dr. Bergquist's 2018 and 2021 opinions concerning Plaintiff's cognitive limitations. Despite this consistency, the ALJ discredited Dr. Bergquist's opinions, stating that they were inconsistent with the record as a whole. For example, the ALJ concluded that Dr. Bergquist's 2018 opinion should be given no weight in part because Plaintiff's October 31, 2018 testing results were inconsistent with Dr. Bergquist's 2018 opinion.[9] Specifically, the ALJ stated the following:

> The claimant underwent a third set of neuropsychological testing October 31, 2018 and her effort on that testing, according to her treating brain psychologist who was the test administer "seemed to be inconsistent, and she was very quick to give up on items that she found difficult. She frequent [sic] would call herself 'stupid', would continue to try when she was pushed to, but often would discontinue. Her effort, while not necessarily poor, did at least seem somewhat inconsistent. She also performed poor on symptom validity testing, performance near the chance level on the first trial of the (Test of Memory Malingering) TOXIM, and performing somewhat better, though still quite poorly on the second trial. Overall results are questionable in terms of their integrity in light of these

---

[9]   In his decision, the ALJ references this Court's remand, stating that the District Court did not consider the ALJ's analysis in his first decision as part of its discussion of testing in the part "B" criteria under the subsection of concentrating, persisting or maintaining pace as reasons for giving little weight to Dr. Bergquist's opinions. (Tr. 796.) This Court appreciates the ALJ's notation. Based on the ALJ's note, the Court presumes the ALJ is referring to the October 31, 2018 testing results.

factors and the patient's behavior during the course of the testing, and will
be interpreted with this in mind". (Exhibit 26F12)

(Tr. 775.) The ALJ, however, does not mention Dr. Bergquist's follow up notes regarding

his assessment of this testing:

> As noted in my psychometric testing report dated October 31, [Plaintiff]
> shows widespread cognitive dysfunction likely due to a variety of factors
> including emotional factors and difficulty in coping contributing to poor
> performance. All of this seems more pronounced, though, since she was
> assessed 3 years ago in October of 2015, the same year she received her
> original injury in 2015.

(Tr. 1491.) Additionally, Dr. Bergquist acknowledged the validity of the testing and

questioned the results but nevertheless still concluded the following:

> I also need to emphasize here for the record, that in light of these findings,
> that [Plaintiff] is entirely unable to function in a competitive work
> environment at present. As a result[], I am totally supportive of her
> application for SSDI benefits.

(Tr. 756.) Thus, despite the results of the test, Dr. Bergquist still concluded that Plaintiff

suffered from widespread cognitive dysfunction. This was not only consistent with his

opinions but with the record as a whole.

Similarly, the ALJ also found Dr. Bergquist's 2018 opinion internally inconsistent

because Dr. Bergquist had assessed Plaintiff as having "mostly mild and moderate

assessments in mental functioning." (Tr. 796.) But the ALJ's finding fails to take into

account the marked limitations that Dr. Bergquist still observed in Plaintiff as well as the

fact that Dr. Bergquist was fully aware of the mild and moderate assessments he had

made before still concluding Plaintiff had cognitive limitations. The ALJ thus did not

adequately consider that Dr. Bergquist had taken these assessments into account when he

made his opinion. *See Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) (stating that the ALJ improperly substituted his lay opinion for that of the expert).

Along with finding Dr. Bergquist's opinion internally inconsistent, the ALJ also concluded that both Dr. Bergquist's 2018 and 2021 opinions were inconsistent with Plaintiff inability to follow her doctor's recommendations, including completing her brain rehabilitation therapy program, limiting her exposure to news, and utilizing various therapy techniques. Dr. Bergquist's opinion, however, was not dependent on Plaintiff's ability to follow her doctor's recommendations. And Plaintiff's difficulty following instructions, a common problem noted throughout her mental health treatment records, merely further demonstrates her cognitive limitations. Also, this Court in its previous September 10, 2020 Order remanding this case rejected this same reasoning: "the ALJ did not provide a good reason as to why Dr. Bergquist could not opine on the Plaintiff's medical issues based on his treatment of Plaintiff up to that point." (Tr. 955.)

In addition, the ALJ found that Dr. Bergquist's opinion was inconsistent with her 2018 PHQ-9 and GAD-7[10] scores, which the ALJ characterized as being in "the mild and

---

[10]     The Patient Health Questionnaire, PHQ–9, is used to screen, diagnose, monitor, and measure the severity of depression. Center for Quality Assessment and Improvement in Mental Health. *See Ramo v. Colvin*, No. 13-CV-1233 (JRT/JJK), 2014 WL 896729, at *5 n.12 (D. Minn. Mar. 6, 2014). Scores of 15-19 indicate moderately severe major depression that warrants treatment with an antidepressant or psychotherapy. *Id.* Scores of 20 and greater indicate severe major depression that warrants treatment with an antidepressant and psychotherapy. *Id.* The highest possible score is 27, if the individual has endorsed all nine categories of symptoms occurring nearly every day. *Id.* The Generalized Anxiety Disorder Screener, GAD-7, is used to assess for generalized anxiety disorder. *Id.* Scores of 8 and above indicate probable anxiety disorder. *Id.* The highest possible score, 21, is achieved if the individual endorses the following symptoms occurring nearly every day: feeling anxious, nervous or on edge; not being able to stop or

moderate range." (Tr. 796.) But, contrary to the ALJ's reference, the Plaintiff's 2018 GAD-7 scores (9, 11, 15, 17, and 21) and PHQ-9 scores (9, 17, 18, and 19) were mostly in the moderately severe (10-14 for GAD-7, 15-19 for PHQ-9) and severe ranges (15-21 for GAD-7). (Tr. 729, 731, 733, 747, 751, 758.) These ranges are also consistent with Dr. Bergquist's opinions.

The ALJ further discredited Dr. Bergquist's opinions stating they are inconsistent with Plaintiff's daily activities and her mental status exams. As for Plaintiff's daily activities, Plaintiff was able to perform some daily activities, but with much difficulty, and still had issues forgetting and understanding directions, issues that are consistent with Dr. Bergquist's opinion. (Tr. 233–35, 288–89.) The ALJ also does not specifically state which mental status exams are inconsistent with Dr. Bergquist's opinions or what about them made them inconsistent. Moreover, this Court's review of Plaintiff's mental status exams noted above reflects similar cognitive difficulties as described in Dr. Bergquist's opinions.

In sum, because Dr. Bergquist's opinions are well supported by medically acceptable evidence and not inconsistent with other substantial evidence in the record, the ALJ failed to give good reasons for why Dr. Bergquist's opinions should be given no weight. Accordingly, remand is required so that the ALJ may reconsider the medical opinions of Dr. Bergquist.

---

control worrying; worrying too much about different things; trouble relaxing; being so restless that it is hard to sit still; becoming easily annoyed or irritated; and feeling afraid, as if something awful might happen. *Id.*

**B. The medical opinions of consultative examining psychologists Drs. William Dickson and Donald Wiger**

### i. Drs. Dickson and Wiger's opinions

On order of the Agency, Plaintiff was examined by two consultative examining psychologists: William Dickson, Ph.D., L.P. and Donald Wiger, Ph.D., L.P. On September 28, 2019, Dr. Dickson performed a consultative exam. (Tr. 1309–23.) Dr. Dickson reviewed Plaintiff's medical history and performed a mental status exam. (*Id.*) In giving his assessment, Dr. Dickson considered a number of diagnostic impressions and psychological factors. (Tr. 1321.) Among other things, he noted that Plaintiff performed "exceptionally poor on gross measures of mental status," she seemed increasingly fatigued as time went by, and that, though she could comprehend and understand his questions if they were concrete and delivered slowly, more complex instruction needed to be simplified. (*Id.*) He also stated the following:

> Regardless of diagnostic impressions, it would seem that [Plaintiff] is functioning very poorly in the home in a simplified concrete environment with low demands. She needs considerable oversight and assistance in daily activities and many adaptive skills, and I do not believe at this time regardless of diagnostic impressions she would be successful independently pursuing full or part-time employment.

(*Id.*)

On July 22, 2020, Dr. Wiger also performed a consultative examination. (Tr. 1389–93.) Like Dr. Dickson, Dr. Wiger reviewed Plaintiff's medical history and performed a mental status exam. (*Id.*) Dr. Wiger opined that Plaintiff suffered from "significant issues with her memory, delay response time, low comprehension, confusion, and concentration." (Tr. 1392.) He further concluded, based on his findings, that:

[Plaintiff] is able to understand and follow directions significantly below average. She is not able to sustain attention and concentration. She is not able to carry out mental tasks with reasonable persistence and pace. She is able to relate appropriately with at least brief and superficial contact with others. She is not able to handle the cognitive stressors of at least an entry-level workplace.

(*Id.*)

### ii. The ALJ's decision regarding Drs. Dickson and Wiger's opinions

The ALJ gave both Drs. Dickson and Wiger no weight because the opinions were inconsistent with the doctors' own reports and the other evidence of record. (Tr. 799–80.) More specifically, for Dr. Dickson, the ALJ stated that Dr. Dickson's opinion was inconsistent with:

- Plaintiff's past neuropsychological testing, which Dr. Dickson had noted he was not sure if Plaintiff had given her best effort on the testing;

- her reported presentation between when he called Dr. Dickson to remind her of her evaluation appointment (i.e., seemed alert, bright, pleasant and well oriented) and when she was at the evaluation (i.e., fatigued, somewhat disoriented, halting with word finding difficulty, slowed, monotone speech, and often vague and tangential);

- her daily activities — Plaintiff alleged to Dr. Dickson that she required all sorts of supervision but yet Plaintiff was capable of driving a motor vehicle, attending her son's athletic events independently, going to the post office daily, and working part-time at Kwik Trip Inc. making meals and as a personal care assistant to another individual; and

- her ability to advocate for herself — notably that Plaintiff had submitted to the ALJ a number of records pertaining of her case without the assistance of her attorney.

(Tr. 800.)

As for Dr. Wiger, the ALJ placed no weight on his opinion because of inconsistency with intelligence testing and because Plaintiff "had no problems interacting with others nor problems with pace and persistence." (*Id.*)

### iii. Drs. Dickson and Wiger's opinions are consistent with the record

Similar to Dr. Bergquist, Plaintiff argues that because Drs. Dickson and Wiger's opinions are consistent with the record, the ALJ failed to adequately explain why their opinions (or a portion of their opinion in Dr. Wiger's case) was given no weight.

Like with treating physicians, the regulations require the ALJ to consider the presence of examining or treating relationships, the nature and frequency of such relationships, the evidence supporting the opinions, the consistency of the opinion with the record as a whole, the specialization of the person giving the opinion, and any other factors that support or refute the opinion. 20 C.F.R. § 404.1527(c). Under these regulations, the ALJ generally must give more weight to physicians who have examined the patient and who are specialists. (*Id.*) Though an ALJ is not required under the regulations to give "good reasons" for the weight given to a non-treating source's medical opinion, if the ALJ does not give controlling weight to a treating source's medical opinion, the ALJ must explain in his decision the weight given to prior administrative medical findings from agency consultants. 20 C.F.R. § 404.1527(e). Ultimately, it is the ALJ's duty to assess all medical opinions and determine the weight given to these opinions. *See Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) ("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'") (citing *Bentley v. Shalala*, 52 F.32 784, 785–87 (8th Cir. 1995)).

Like Dr. Bergquist's opinions, this Court finds that Dr. Dickson's and Dr. Wiger's opinions are well-supported and consistent with the substantial evidence in the record showing that Plaintiff suffered from cognitive limitations, which this Court has already summarized above. This Court also finds the ALJ's reasons for discrediting Dr. Dickson's and Dr. Wiger's opinions (Plaintiff's past testing results and daily activities) are flawed for the same reasons iterated above regarding Dr. Bergquist. For example, just like Dr. Bergquist, both Dr. Dickson and Dr. Wiger acknowledged the questionable results of Plaintiff's October 2018 neuropsychological evaluation, but nonetheless concluded that she would still suffer from cognitive limitations that precluded her from employment. (Tr. 1321, 1392.) The ALJ failed to acknowledge this in his decision.

The ALJ gave additional reasons for discrediting Dr. Dickson's and Dr. Wiger's opinions. But these additional reasons are also flawed.

The ALJ discredited Dr. Dickson's opinion in part because of the difference between Plaintiff's appearance over the phone (bright and alert) versus her appearance at her appointment (fatigued and slow). But, just like the results of the October 2018 testing, Dr. Dickson was fully aware of Plaintiff's appearance when he made his opinion. The ALJ also discredited Dr. Dickson's opinion because Plaintiff had been able to submit records to the ALJ without the assistance of an attorney. However, Plaintiff's ability to advocate for herself is not an indication that her purported limitations are inconsistent.

Finally, the ALJ discredited Dr. Wiger's opinion because Plaintiff had no problems interacting with others nor problems with pace and persistence. But as Plaintiff

points out, and as the Court has already summarized above, the record does document deficits in concentration, pace, and persistence. (Pl.'s Br. 27.)

In sum, because Dr. Dickson's and Dr. Wiger's opinions are well supported by medically acceptable evidence and not inconsistent with other substantial evidence in the record, the ALJ failed to adequately explain why Dr. Dickson and Dr. Wiger's opinions should be given no weight. Accordingly, remand is required so that the ALJ can reconsider Dr. Dickson's and Dr. Wiger's opinions, along with Dr. Bergquist's opinions.

## ORDER

Based on the foregoing, and on the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 21) is **GRANTED IN PART** and **DENIED IN PART**; and

2.      Defendant's Motion for Summary Judgment (Doc. No. 30) is **DENIED**.

3.      This matter is remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four), consistent with this Memorandum Order and Opinion regarding the ALJ's determination of Plaintiff's RFC. On remand, the ALJ must reconsider the opinions of Dr. Bergquist, Dr. Dickson, and Dr. Wiger regarding Plaintiff's mental limitations. The ALJ must then redetermine Plaintiff's RFC and make new findings based on that RFC at steps four and five of the analysis.[11]

---

[11]      Because this matter will be remanded for further consideration of the medical opinion evidence, the Court need not address Plaintiff's arguments regarding Plaintiff's subjective complaints.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: September 13, 2022                    *s/ Becky R. Thorson*
                                            BECKY R. THORSON
                                            United States Magistrate Judge